FILED

NOV 2 7 2006

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

MELINDA S. COOK,

        Plaintiff,

vs.                             **Civil Action No. 3:06CV12**
                                 **(Judge W. Craig Broadwater)**

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION/OPINION

Melinda S. Cook brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant," and sometimes "Commissioner") denying her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on Plaintiff's Statement of Errors and Defendant's Motion for Summary Judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); Standing Order No.6.

## I. Procedural History

Melinda S. Cook ("Plaintiff") filed applications for SSI and DIB on November 27, 2002, with a protective date of November 18, 2002, alleging disability since February 28, 2001, due to post-traumatic stress disorder, depression, right shoulder injury, back injury, right hand injury, and being legally blind in her left eye (R. 94-97, 123, 321-24). The state agency denied Plaintiff's applications initially and on reconsideration (R. 43, 325). Plaintiff requested a hearing, which Administrative Law Judge Stephen D. Slahta ("ALJ") held on December 17, 2003, and at which

Plaintiff, represented by counsel, and Lawrence Ostrowski, a vocational expert ("VE") testified (R. 346-77). On February 6, 2004, the ALJ entered a decision finding Plaintiff was not disabled (R. 48-64). Plaintiff's request for review by the Appeals Council was granted and the case was remanded to the ALJ on April 28, 2004 (R. 65-69). ALJ Slahta conducted a second hearing on October 21, 2004, at which Plaintiff, who was represented by counsel, and VE Larry Bell testified (R. 378-400). On December 30, 2004, the ALJ issued a second decision on Plaintiff's claim, again finding her not disabled (R. 20-30). On January 13, 2005, Plaintiff requested review of the ALJ's decision by the Appeals Council (R. 15). The Appeals Council denied Plaintiff's request for review on December 7, 2005, making the ALJ's decision the final decision of the Commissioner (R. 9-11).

## II. Statement of Facts

Plaintiff was born on June 11, 1969, and was thirty-five (35) years old at the time of the October 21, 2004, administrative hearing (R. 95, 380). Plaintiff received a GED on June 13, 1994 (R. 21, 129, 380). She also attended classes and received training in Residential Care and Treatment of Mentally Retarded Individuals, CPR, first aid, and food handling from November 1989 to February 2001 (R. 129). Her past work included coordinator at a residential home for the mentally challenged, day care center worker, and security guard (R. 124).

On June 26, 2001, Plaintiff presented to Douglas Midcap, D.O., for reevaluation of her hand and shoulder injury. Plaintiff informed Dr. Midcap that she experienced stress and anxiety due to her job situation and that she "could not work in the same environment anymore." Plaintiff had not worked for the past three months. Plaintiff stated she felt "a lot better" relative to her depression due to the Wellbutrin, but she still experienced movement difficulties with her right hand (R. 211).

On July 2, 2001, Dr. Midcap wrote Plaintiff had sustained an injury to her right hand several

2

years ago, which caused continued difficulty in her performing repetitive motions, lifting, turning, and grasping. Dr. Midcap wrote Plaintiff's ability "to do alot [sic] of repetitive work motion with her right hand and right wrist" was limited (R. 213).

Also on July 2, 2001, Dr. Midcap wrote Plaintiff had a history of depression and anxiety secondary to her work situation, which caused her not to be working. Dr. Midcap noted Plaintiff's depression and anxiety were being treated with Wellbutrin, which was "working very well" (R. 212).

On October 29, 2001, Plaintiff informed Dr. Midcap that she felt "fine and the Wellbutrin [was] helping her anxiety/depression tremendously." Plaintiff denied any physical complaints, except for right shoulder pain, which she thought was related to work. Plaintiff had no "other complaints including GI, GU, chest pains or palpations." Plaintiff was diagnosed with anxiety and depression and right shoulder pain. Dr. Midcap prescribed Wellbutrin 150mg (R. 210).

On March 18, 2002, Plaintiff presented to Dr. Midcap for a "recheck [of] her GERD symptoms." Plaintiff informed Dr. Midcap that she was "doing very well on reflux medicine, Prevacid." Plaintiff stated "[h]er shoulder, neck and mid-back pain [were] just killing her." Plaintiff informed Dr. Midcap that she was experiencing radicular-type pain that went down her hand and her shoulder area. Plaintiff stated her moving her neck a certain way caused pain. Plaintiff's distal neurosensory and distal grips were good. Dr. Midcap noted Plaintiff had pinpoint tenderness in her mid back. Dr. Midcap ordered a x-ray and told Plaintiff to treat her pain with "warm moist heat" (R. 208).

On May 13, 2002, Dr. Midcap noted Plaintiff's triglycerides and cholesterol levels were reduced. Plaintiff discussed her "compensation situation" with Dr. Midcap, who instructed Plaintiff to see an orthopedic surgeon and to get x-rays. Dr. Midcap observed Plaintiff's right shoulder and

3

neck had poor range of motion. He provided samples of medication to Plaintiff and instructed her to return in one month for a follow-up examination (R. 207).

On September 9, 2002, Dr. Midcap noted Plaintiff experienced chronic low back pain and chronic right shoulder pain. He found she had gastritis and worsening reflux symptoms. He observed Plaintiff was tender to palpation on the lumbosacral area and her right shoulder had crepitus. Plaintiff demonstrated poor range of motions in complete flexion and extension. Her distal grips were good and her distal neurosensory was good. Dr. Midcap referred Plaintiff to physical therapy for her pain, ordered a MRI of her right shoulder, and ordered an upper GI (R. 206).

On October 31, 2002, Dr. Midcap authored a letter, wherein he opined Plaintiff could not lift more than ten pounds and her right shoulder, back, and bilateral wrist pain prevented her from performing repetitive motions (R. 205, 209).

On December 2, 2002, Victor Cerra, Ed.D., a psychologist, evaluated Plaintiff as per Dr. Midcap's request (R. 228-29). He memorialized his findings in a December 9, 2002, letter to Dr. Midcap. In that letter, Dr. Cerra wrote Plaintiff exhibited "several of the symptoms of Post Traumatic Stress Disorder" because of her having been "forced to resign her job because of a hostile work environment." Dr. Cerra noted Plaintiff was "nearly agoraphobic for fear she will bump into someone from work." Dr. Cerra informed Dr. Midcap Plaintiff experienced panic attacks, was hyper vigilant, constantly thought about work, and experienced erratic sleep patterns. Dr. Cerra wrote Plaintiff's appetite was erratic, which caused her to gain forty pounds. Dr. Cerra informed Dr. Midcap that Plaintiff stated her memory and concentration was impaired and that she felt "compulsive about her house," in that she could not breathe if her house was dirty. Dr. Cerra wrote Plaintiff's parents and sister were on antidepressants. He wrote Plaintiff was "under financial stress"

due to unemployment benefits having ended and her not receiving child support. Dr. Cerra wrote Plaintiff was unable to find employment due to medical restrictions, namely no visual depth perception, being legally blind, weight restrictions, and repetitive motion restrictions. Dr. Cerra wrote Plaintiff's condition would not be resolved in the "short term however [he] believe[d] she will need ongoing chemotherapy [sic]" (R. 222, 345).

On December 16, 2002, Steven C. Miller, M.D., authored a letter to the West Virginia Bureau of Employment Programs – Workers' Compensation Division relative to Plaintiff's condition. He wrote Dr. Midcap had referred Plaintiff for a consultative evaluation. Dr. Miller wrote Plaintiff asserted Dr. Midcap had "dropped [her as] . . . [a] patient as he no longer apparently [saw] West Virginia Workers Compensation patients" (R. 220). Dr. Miller's impression was that Plaintiff had a combination neck and shoulder problem. He opined he could not be more specific because he needed further testing to make a diagnosis. Dr. Miller recommended Plaintiff undergo a MRI of her shoulder and cervical spine (R. 223).

On December 19, 2002, Stephen Nutter, M.D., completed an Internal Medicine Examination of Plaintiff (R. 171-75). Plaintiff's stated her chief complaint was as follows: "The main thing I'm trying for is my PTSD, but physically I have problems with my back, shoulder and hands." There were no medical records available for Dr. Nutter's review in completing the IME. Plaintiff stated she had experienced pain in her back since 1997 and in her lower back since 1999. Plaintiff informed Dr. Nutter she had not had a CT scan, MRI, myelogram, EMG/nerve conduction study or surgery of her back. Plaintiff stated she had constant pain in her upper back and intermittent pain in her neck and lower back. Plaintiff stated her back pain radiated down her right leg and her neck pain radiated down her right arm into her hand. Plaintiff stated her back pain was aggravated by

bending, stooping, sitting, lifting, standing, sneezing, and riding in a car. Plaintiff stated she experienced neck pain, which was aggravated by her turning her head and with rapid motions of her head and neck. Plaintiff stated she had never undergone physical therapy or worn a neck brace for her neck pain (R. 171). Plaintiff stated she injured her hand and shoulder in 1994, which caused warmth and tenderness in her hand (R. 171-72). Plaintiff stated repetitive motion increased pain to her shoulder and hand. Plaintiff had x-rays done of her shoulder and hand, but she had not undergone a CT scan, MRI, joint injection or aspiration of those areas. Plaintiff stated that recent use of a "weed-eater" caused tingling and vibrating in her shoulder and hand. Plaintiff stated her hands became "frozen like" when she attempted to peel potatoes. Plaintiff informed Dr. Nutter that she was currently medicating with Wellbutrin, Aciphex, and Tricor. Plaintiff stated she smoked one-half package of cigarettes per day for the past twelve years (R. 172).

Plaintiff stated she experienced abdominal pain and nausea and had lost twenty to twenty-five pounds during the past ten months (R. 172). Plaintiff did not experience shortness of breath, coughing, or chest pain. Plaintiff's weight was one-hundred and ninety pounds; her blood pressure was 160/76; her visual acuity was 20/25 in right eye; and Plaintiff reported she could not see the eye chart with her left eye. Dr. Nutter observed Plaintiff ambulated with a normal gait, did not use an assistive device for ambulation, appeared stable at station, and was comfortable in supine and sitting positions. Plaintiff's intellectual functioning appeared normal during the examination and her recent and remote memories were "good" for medical events (R. 173).

Dr. Nutter noted Plaintiff's HEENT, neck, chest, cardiovascular, and abdomen examinations revealed normal results (R. 173). Plaintiff complained of pain and tenderness in her right shoulder during Dr. Nutter's examination. Plaintiff complained of pain during range of motion testing of her neck and shoulder. Plaintiff complained of pain and tenderness in both wrists. Plaintiff's Tinel and

6

Phalen's signs were negative bilaterally. Dr. Nutter noted Plaintiff had no tenderness or pain in her left shoulder or either elbow. He observed no redness, warmth, swelling, or nodules when examining Plaintiff's upper extremities. Likewise, Dr. Nutter observed no tenderness, redness, warmth, or swelling of Plaintiff's hands. He observed no atrophy. Plaintiff was able to make a fist bilaterally. Dr. Nutter observed no Heberden or Bouchard's nodes. Plaintiff was able to write and pickup coins bilaterally. Plaintiff's grip strength was "4-4.5/5 on the right" and normal on the left. Dr. Nutter's examination of Plaintiff's lower extremities revealed no tenderness, redness, warmth, swelling, fluid, laxity, or crepitus of her knees, ankles or feet. Plaintiff did not have calf tenderness, redness, warmth, cord sign or Homans sign. Plaintiff complained of pain on range of motion testing of her knees (R. 174).

Plaintiff also complained of pain and tenderness in her paraspinal muscles and spinous processes during Dr. Nutter's cervical spine examination. Dr. Nutter found no evidence of paravertebral muscle spasm. Plaintiff's dorsolumbar spine had normal curvature. Dr. Nutter noted mild muscle spasm in the thoracic spine area. Plaintiff complained of tenderness from L3 to L5 and from T1 to T6. Plaintiff complained of pain during her back range of motion testing. Plaintiff complained of pain at twenty degrees on the right and twenty degrees on the left during her straight leg raising rest. Plaintiff could stand on one leg at a time. Dr. Nutter observed no hip joint tenderness, redness, warmth, swelling, or crepitus (R. 174).

Dr. Nutter found Plaintiff's cranial nerves were intact and muscle strength and tone in her left upper extremity were normal. Plaintiff had decreased strength of 4/5 in her right upper biceps. Plaintiff complained of pain in her right arm. Plaintiff's triceps strength was equal bilaterally (R. 174). Lower extremity muscle strength was equal and normal bilaterally. Plaintiff did have

7

"giveaway weakness" in her knees. Plaintiff had no atrophy, her sensory modalities were well preserved, her Hoffmann and Babinski's signs were negative, she had no clonus, her cerebellar function was intact, she could walk on her heels and toes, she could perform a tandem gait, and Plaintiff could squat. Plaintiff's biceps, triceps, brachiodradialis, patellar and Achilles deep tendon reflexes were symmetrical and graded normally bilaterally (R. 175).

Dr. Nutter's impression was for chronic back and neck pain in the form of acute and chronic thoracic strain and chronic cervical and lumbosacral strain. He also diagnosed arthralgia, which he noted was posttraumatic and degenerative arthritis. Dr. Nutter opined Plaintiff had no evidence of nerve root compression and no evidence of rheumatoid arthritis (R. 175).

At her December 21, 2002, session with Dr. Cerra, Plaintiff appeared to be "managing well." They discussed Plaintiff's son's reaction to his father and stepmother's relationship (R. 227).

On December 30, 2002, Paul O. Young, Ph.D., completed an Adult Mental Profile of Plaintiff (R. 179-85). Plaintiff stated she was seeking disability benefits "due to posttraumatic stress disorder difficulties, back, shoulder, neck, and arm problems." Plaintiff reported she had been experiencing depression. Plaintiff stated "her difficulties began in [July] 1999" and they interfered with her ability to work beginning in April 2000. Dr. Young observed Plaintiff's gait and posture were good. She drove to the evaluation. (R. 179). Plaintiff stated her back, neck, and arm pain was a "6" on a scale of "1 to 10." Plaintiff stated she was legally blind in her left eye and had no depth perception in her right eye (R. 180).

Plaintiff reported no hallucinations, paranoid ideations, delusions, preoccupations, disorientation, thought broadcasting, thought insertions, obsessive-compulsive behaviors, agoraphobia, difficulties making daily decisions, feelings of hopelessness, feelings of uselessness,

8

feelings of worthlessness, suicidal ideations, homicidal ideations, crying spells, attention difficulties, or concentration difficulties. Plaintiff stated she did have difficulty staying focused at times, did have difficulty sleeping, was fearful of seeing someone she may know if she left the house, worried a great deal, had low morale, was anxious and tense, was moody and irritable, had racing thoughts, and experienced panic attacks. Plaintiff informed Dr. Young she had "some PTSD problems" that involved "incidents that occurred at [her] place of employment." Plaintiff stated her past work environment was "horrible" and she was mentally harassed at her former job. Plaintiff had nightmares and flashbacks of former work experiences. Plaintiff stated she enjoyed being in the company of others and still had an interest in activities she found pleasurable (R. 180).

No psychological records were provided to Dr. Young for his review in making his assessment (R. 180). Plaintiff reported she had never been hospitalized for psychiatric-related symptoms. Plaintiff stated she was referred for psychological therapy for two sessions per month but had seen a psychologist three times since November, 2002. Plaintiff stated she had been diagnosed with posttraumatic stress disorder. Plaintiff reported smoking one-half packages of cigarettes per day. She listed her medication as Wellbutrin, Tarcor, and Aciphex. Plaintiff stated she had worked as a children's care giver for three years "off and on" and had worked at a home for the mentally challenged for ten and one-half years. Plaintiff denied "any difficulties interpersonally interacting with co-workers or supervisory personnel." Plaintiff stated she had had "a good and loving childhood." She reported no abuse as a child. Plaintiff stated she was divorced (R. 181).

Dr. Young observed Plaintiff to be alert and cooperative during the evaluation. She made good eye contact, was motivated, and appeared to work to the best of her ability. Her speech was intelligible, coherent, relevant, and non-pressured. She was oriented "x3." Her affect was flat and

9

she demonstrated "indices of anxiety.' Her thought processes were intact during the evaluation and her thought content was void of significant preoccupations, paranoid ideations, and delusions. She demonstrated no perceptual deficits, hallucinations, or perseverations. Her insight was adequate; her judgment was average; her psychomotor activity was not elevated. Dr. Young noted the following functional abilities as to Plaintiff: concentration was good; social was normal; immediate memory was normal; recent memory was normal; long-term memory was normal; persistence was normal; and pace was normal (R. 182). Plaintiff scored the following on the WAIS III IQ test: Verbal IQ was 102; Performance IQ was 99; Full Scale IQ was 101 (R. 182-83). Dr. Young found Plaintiff was functioning in the average range of intellectual ability. Plaintiff scored as follows on the WRAT-III: reading was high school range; spelling was sixth grade range; arithmetic was high-school range (R. 183).

Plaintiff described her daily routine as follows: rose at 7:30 a.m. or 8:00 a.m.; readied her son for school; did some housecleaning; did dishes; ate breakfast; bathed "at times"; did laundry; watched television; ran errands; kept "busy"; watched more television; seldom napped; cooked; ate dinner; assisted her child with his homework assignments; visited her parents; retired between 11:00 p.m. and 1:00 a.m. Plaintiff also did light yard work, drove, shopped, used a computer, listened to music, and handled her own financial transactions. Plaintiff did not belong to any groups, clubs, or social organizations. She did not attend church. She periodically ate in restaurants, she maintained friendships with two people, she talked to neighbors, she talked on the phone, she did not date, and she "generally stay[ed] to herself" (R. 184).

Dr. Young's diagnostic impression was as follows: Axis I – postraumatic stress disorder and depressive disorder that was not otherwise specified; Axis II – no diagnosis; Axis III – reported back,

10

shoulder, neck, and arm pain (R. 184). Dr. Young opined "[p]resently, her diagnosis of PTSD concurs with what she indicates her current psychologist has diagnosed her with and also concurs with symptomatology involving nightmares and flashbacks of the incidents that occurred at work. She also report[ed] a fear of leaving her home and going to places where she may run into people that she had previously worked with. She reports continued feelings of depression since 1999 but denies any feelings of hopelessness or uselessness or suicidal ideations" (R. 185). Dr. Young's recommendation was Plaintiff undergo individual psychotherapy and opined Plaintiff was capable of adequately managing any benefits she may be awarded (R. 185).

On January 13, 2003, Samuel Goots, Ph.D., completed a Psychiatric Review Technique of Plaintiff (R. 186-99). He found Plaintiff had impairments that were not severe. Dr. Goots found Plaintiff had affective disorders and anxiety-related disorders (R. 186). Dr. Goots found Plaintiff's affective disorder was depression "D/O, NOS," and her anxiety-related disorder was PTSD (R. 189, 191). Dr. Goots found Plaintiff's impairments caused no restriction of activities of daily living; mild limitations of her ability to maintain social functioning; and mild limitations of her ability to maintain concentration, persistence, or pace. Dr. Goots found Plaintiff had experienced no episodes of decompensation (R. 196).

On January 14, 2003, Plaintiff reported to Dr. Cerra that she was following his behavior plan relative to her interaction with her son. Plaintiff stated she did not want to wear a coat because she felt "'smothered and [as though she could not] breath.'" Plaintiff admitted to being "out of shape." Plaintiff reported she went to "bingo with mother." Dr. Cerra's homework assignment was for Plaintiff to focus on self soothing ideas (R. 227).

On February 5, 2003, Plaintiff informed Dr. Cerra she was "exhausted." They discussed her

financial situation. Plaintiff reported she had not gone anywhere (R. 226).

On February 15, 2003, Plaintiff had a MRI of her right shoulder made. It was unremarkable (R. 218).

On February 24, 2003, Plaintiff returned to Dr. Midcap, who opined Plaintiff's triglycerides and cholesterol were improved and her neck, shoulder, and mid-back were "bothersome." Dr. Midcap informed Plaintiff he would see her only one time for her Workers' Compensation referral and attempt to obtain an appointment for her with a neurosurgeon, neurologist, or orthopedic specialist. He suggested Plaintiff undergo physical therapy and obtain a MRI of her neck. Dr. Midcap noted Plaintiff's MRI of her shoulder "was completely normal." Dr. Midcap observed poor range of motion of Plaintiff's neck and shoulder (R. 200).

Also on February 24, 2003, Dr. Miller completed a Routine Abstract Form Physical of Plaintiff (R. 214-17). He opined Plaintiff's pain "seem[ed] to be coming from trigger point and trapezius muscle and these appear[ed] to be unrelated to her shoulder joint which appeared normal on MRI scan and x-ray." Dr. Miller recommended Plaintiff follow-up with Dr. Midcap for her back and neck symptoms; consult with a neurologist or neurosurgeon for her neck; undergo a cervical spine work up; and seek referral through Dr. Midcap for treatment of her spinal symptoms (R. 217).

On March 25, 2003, Plaintiff reported to Dr. Cerra that she was "doing good." Plaintiff had gone to the market twice and had gone once to her attorney's office. She reported her son was doing well and his grades were improving. Dr. Cerra's assignment to Plaintiff was to go to a supermarket twice in one week (R. 226).

Dr. Cerra's April 18, 2003, treatment notes read Plaintiff had two panic attacks. One was caused by Plaintiff having "bumped into [a] person [she] did not want to see." Plaintiff reported she

sat in car at son's baseball games. Plaintiff stated she was unable to take her son to baseball practice because "[she] just couldn't do it." Plaintiff reported her son's father was moving back to the area and would be "a help during summer." Plaintiff stated she was feeling stress because she was moving soon (R. 266).

Also on April 18, 2003, Dr. Cerra completed a Routine Abstract Form Mental of Plaintiff (R. 231-33). He noted Plaintiff's history of treatment was for depression with anxiety and anxiety attacks since 1999. He found Plaintiff was oriented times three (R. 231). He found Plaintiff's affect was broad; her mood was depressed and anxious; her perception, insight, thought content, and psychomotor activity were normal. Dr. Cerra found Plaintiff's immediate memory was normal, her social functioning was moderately deficient, her concentration was moderately deficient, her task persistence was mildly deficient, and her pace was normal. Dr. Cerra did not offer an opinion as to Plaintiff's recent memory. He diagnosed PTSD and pain disorder. He recommended psychotherapy and medications as treatments (R. 232).

On April 30, 2003, a Psychiatric Review Technique was completed of Plaintiff by Robert Marinelli, Ed.D. (R. 234-47). Dr. Marinelli found Plaintiff had affective disorders and anxiety-related disorders. As to Dr. Marinelli's medical disposition of Plaintiff, he noted a RFC assessment was necessary (R. 234). Dr. Marinelli opined Plaintiff's affective disorder was "Depression D/O NOS" and her affective-related disorders were "PTSD, Depression D/O" (R. 237, 239). Dr. Marinelli found Plaintiff's impairments caused a mild degree of limitation to her activities of daily living; a mild limitation to her ability to maintain social functioning; and a moderate degree of limitation in her ability to maintain concentration, persistence, or pace. Dr. Marinelli found Plaintiff had never experienced a episode of decompensation (R. 244).

13

Also on April 30, 2003, Dr. Marinelli completed a Mental Residual Functional Capacity Assessment of Plaintiff (R. 248-51). He found Plaintiff was not significantly limited in her ability to remember locations and work-like procedures and in her ability to understand and remember very short and simple instructions. Dr. Marinelli found Plaintiff was moderately limited in her ability to understand and remember detailed instructions. Dr. Marinelli found Plaintiff was not significantly limited in the following areas of sustained concentration and persistence: ability to carry out very short and simple instructions; ability to sustain an ordinary routine without special supervision; ability to work in coordination with or proximity to others without being distracted by them; and ability to make simple work-related decisions (R. 248). He opined Plaintiff was moderately limited in her ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods, and ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (R. 248-49). Dr. Marinelli found Plaintiff was either not significantly limited or had no limitations in her social interaction abilities and her ability to adapt (R. 249). Dr. Marinelli found Plaintiff had the "residual mental functioning capacity to perform routine competitive employment involving short & simple instructions" (R. 250).

On May 5, 2003, Fulvio R. Franyutti, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff (R. 252-59). He found Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push and/or pull unlimited (R. 253). Dr. Franyutti found Plaintiff could occasionally climb, balance, stoop, kneel, crouch, or crawl (R. 254). He found Plaintiff had no

14

manipulative, visual, or communicative limitations (R. 255-56). Additionally, Dr. Franyutti found Plaintiff was unlimited in her exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards (R. 256). Dr. Franyutti reduced Plaintiff's RFC to medium because of "pain of ROM & fatigue" (R. 257).

Dr. Cerra's May 9, 2003, treatment notes revealed Plaintiff was experiencing stress because she was moving. Plaintiff reported she had been attending her son's baseball games (R. 266).

On June 3, 2003, Plaintiff reported to Dr. Cerra that she was "overwhelmed" by her moving from one house to another (R. 266). She reported she was again denied an award of social security benefits (R. 267).

On July 17, 2003, Dr. Cerra's treatment notes of Plaintiff reflected Plaintiff had been involved in a "fender bender." Plaintiff stated she did "not [feel] comfortable driving – even though its [sic] [the accident] not my fault." Plaintiff also stated her house moving had gone "'pretty good.'" Plaintiff stated she was filing for sole custody of her son. Plaintiff reported she had presented to an emergency room the previous evening due to shortness of breath, which she thought was caused by anxiety. Plaintiff stated she had "handed over SS to lawyers." Dr. Cerra noted it did not appear as though Plaintiff was "getting out much except [to attend] sons [sic] games" (R. 267).

On August 19, 2003, Dr. Cerra wrote a letter, addressed "To Whom It May Concern." The letter contained the following information: Plaintiff had been a patient of his since November 18 , 2002, and had been treated by him for a severe anxiety disorder; Plaintiff's symptoms included agoraphobia, panic attacks, disturbance of concentration and memory. Dr. Cerra wrote Plaintiff had reported to an emergency room recently as a result of a panic attack and that she had experienced gastrointestinal symptoms due to anxiety. Dr. Cerra opined he felt it was "unlikely [Plaintiff] could

discharge the duties of a juror" (R. 260).

On September 16, 2003, Plaintiff reported to Dr. Cerra she had "won one of her comp cases," to which she referred as a "very mixed blessing." Plaintiff informed Dr. Cerra she had stopped taking Buspar because it "'made [her a] mess" in that is caused her "depression [to] deepen." Plaintiff continued to medicate her depression with Wellbutrin (R. 268).

On September 26, 2003, Plaintiff presented to Doctors Urgent Care for fasting laboratory tests. Plaintiff reported she experienced anxiety due to her rearing her son, who had ADHD, and her current financial matters. Plaintiff reported having "a lot of panic attacks." It was noted Plaintiff was treating those conditions with BuSpar and Wellbutrin. Plaintiff stated "it works with anxiety" (R. 273-74).

On October 3, 2003, Plaintiff reported to Dr. Cerra she was doing "pretty good"; however, her thoughts raced at night she reported (R. 269).

On October 23, 2003, Plaintiff presented to Doctors Urgent Care with complaints of burning in her joint, her hands aching and falling "asleep," inability to squeeze with her hands, and a rash. She did not have a fever or chills. The doctor ordered "a battery of blood work for rheumatoid factor." Plaintiff was provided prednisone and given an injection of dexamethasone (R. 271-72).

On November 21, 2003, Dr. Cerra's treatment notes read Plaintiff had shopped at a grocery store, had attended a funeral, and had attended a benefit dinner (R. 270, 315).

On December 11, 2003, Dr. Cerra completed a Questionnaire as to Mental Residual Functional Capacity of Plaintiff. He found Plaintiff was extremely impaired in her ability to accept instruction from or respond appropriately to criticism from supervisors or superiors. Dr. Cerra found Plaintiff was markedly impaired in her ability to work in coordination with or in proximity to others

without distracting them or exhibiting behavioral extremes. He found Plaintiff was markedly impaired in her ability to respond appropriately to co-workers or peers (R. 262). Dr. Cerra found Plaintiff was markedly impaired in her ability to relate to general public and maintain socially appropriate behavior. Dr. Cerra opined his opinion could "possibly"" . . . "change if only minimal contact or interaction with others [was] required." Dr. Cerra found Plaintiff was markedly impaired in her ability to perform and complete work tasks in a normal work day or week at a consistent pace; was markedly impaired in her ability to work in cooperation with or in proximity to others without being distracted by them; and was markedly impaired in her ability to process subjective information accurately and to use appropriate judgment. Dr. Cerra found Plaintiff was moderately limited in her ability to carry through instructions and complete tasks independently; was moderately limited in her ability to maintain attention and concentration for more than brief periods of time; and was moderately limited in her ability to perform at production levels expected by most employers (R. 263). Dr. Cerra found Plaintiff was moderately limited in her ability to respond appropriately to changes in a work setting. He found Plaintiff was mildly limited in her ability to remember locations and workday procedures and instructions; mildly limited in her ability to be aware of normal hazards and take necessary precautions; mildly impaired in her ability to behave predictably, reliably and in an emotional stable manner; and mildly impaired in her ability to maintain personal appearance and hygiene. Dr. Cerra found Plaintiff was markedly limited in her ability to tolerate customary work pressures. Dr. Cerra opined Plaintiff's condition would likely deteriorate if she were placed under stress at work. Dr. Cerra opined Plaintiff could manage her finances (R. 264). Dr. Cerra further opined that Plaintiff's impairment was expected to last for at least twelve months (R. 265).

On December 16, 2003, Dr. Midcap completed a Physical Capacity Evaluation of Plaintiff.

He opined Plaintiff could stand less than one hour in an eight-hour workday; walk less than two hours in an eight-hour workday; sit less than two hours in an eight-hour workday; occasionally lift and/or carry less than ten pounds in an eight-hour workday; and frequently lift and/or carry less than ten pounds in an eight-hour workday (R. 275). Dr. Midcap found Plaintiff could not use her right hand for simple grasping and handling, pushing and pulling, and fine manipulation and fingering. Dr. Midcap found Plaintiff could use her feet for repetitive movements and could occasionally bend, kneel, squat, climb stairs, and climb ladders, but never crawl. Dr. Midcap found Plaintiff was unable to reach above shoulder level (R. 276).

On December 19, 2003, Dr. Cerra's treatment notes read Plaintiff had traveled to a grocery market twice and department store once, was using her medical card, had begun physical therapy, was scheduled to undergo a MRI, and was scheduled for an IME in the near future relative to her shoulder (R. 315).

On December 20, 2003, a MRI was made of Plaintiff's cervical spine. It showed a mild central bulging of the discs at C3-4 and a small left paracentral herniated disc at C4-5, which "compressed the ventral surface of the subarachnoid space but [did] not compress the cord at [that] time" (R. 279).

On December 22, 2003, a MRI was made of Plaintiff's lumbar spine. It showed a small paracentral herniated disc at L4-5, which was "not causing any significant spinal stenosis, encroachment on the neural foramina, or compression of the nerve roots at [that] time" (R. 277).

On January 9, 2004, Plaintiff reported to Dr. Cerra she continued with physical therapy. Plaintiff stated her memory had been "bad" since she had "been sick" (R. 315). Plaintiff reported she had experienced a "couple" panic attacks and she used breathing techniques during those attacks.

18

Plaintiff stated she had gone to the market four times. Plaintiff reported a fear of fire (R. 316).

On February 6, 2004, Plaintiff reported to Dr. Cerra her fire fear had improved by fifty percent and that she was feeling "ok." Plaintiff reported no panic attacks. She informed Dr. Cerra a MRI revealed a bulging disc in her neck and a herniated disc in her lower back. Plaintiff also reported she had experienced a serious gallbladder attack (R. 316).

On March 11, 2004, Plaintiff reported to Dr. Cerra she had had her gallbladder removed two weeks earlier and was "doing well – 'you wouldn't believe the difference.'" Plaintiff stated she continued physical therapy for her spine. Plaintiff reported she had spilled hot coffee on herself in December when she was not served appropriately. Plaintiff stated the following, "Unintentionally, I've been a hermit" (R. 316).

On March 22, 2004, Plaintiff underwent an eye examination by Kathryn M. Clark, O.D. Plaintiff's left unaided distance visual acuity was 20/400, which improved to 20/300 with glasses due to Plaintiff's farsightedness with astigmatism. Plaintiff was positive for hypertropia of her left eye. All other ocular examinations were normal. Dr. Clark recommended Plaintiff have her eyes examined every two years (R. 320).

On May 11, 2004, Plaintiff informed Dr. Cerra she was "a mess." She stated she had "put in 15 flowers yesterday – that's all [she] did." Plaintiff stated she was getting out more and was "[t]hinking of going to [Florida] to pick up son" (R. 317).

On June 8, 2004, Dr. Cerra noted Plaintiff was in "some distress" because of the absence of her son. Plaintiff stated she had never been apart from her son for such a long period of time. Dr. Cerra noted Plaintiff's lack of social support (R. 317).

At Plaintiff's July 10, 2004, session with Dr. Cerra, she noted her son had returned, and that

provided a "'big boost'" to her (R. 317).

On August 27, 2004, Plaintiff reported to Dr. Cerra she had school shopped with her son (R.

318).

On October 21, 2004, ALJ Slahta conducted an administrative hearing of Plaintiff's claim

(R. 378-400). The following question/answer exchange occurred between the ALJ and VE Bell:

> ALJ: I'm going to give the . . . hypothetical as . . . [s]edentary, sit/stand, occasional
> posturals, and . . . no repetitive overhead reaching. . . . Primarily gross grasping as
> oppose [sic] to repetitive fine manipulation. No hazardous. And work that is
> unskilled and low stress. Defined as one or two step processes, routine and repetitive
> tasks. Primarily working with things, rather than people. Entry level. With those
> limitations, can you describe any work that this hypothetical individual can perform?
> (R. 396).

> VE: At the sedentary level, Your Honor, that hypothetical individual could function in
> some general office clerk positions. The total number available 299,000 nationally,
> and 2900 regionally. The region is West Virginia, Eastern Ohio, Western
> Pennsylvania and Western Maryland. But I would give at least a 50 percent
> reduction because some of those would have like addressing envelopes and things
> like that that would be considered more fine manipulation. It wouldn't comply with
> your hypothetical. (R. 396-97).
> And machine tender, sedentary, 141,000 nationally and 1400 regionally (R. 397).

> ALJ: There's one interpretation of Dr Sara's [sic] MRFC in Exhibit 13F . . . entail
> concentration. Relate to concentration. If [Plaintiff] cannot stay on task 1/3 to 2/3s
> [sic] of the time, are those jobs affected? (R. 397).

> VE: Those would be eliminated, Your Honor (r. 397).

> ALJ: What is the tolerable limited of absenteeism in the jobs you named, Mr. Bell? (R.
> 397).

> VE: If you are going to miss more than two days a month, I believe the supervisor would
> try to intervene and if not corrected, would fairly quickly result in termination (R.
> 397-98).

On October 28, 2004, Dr. Cerra completed a Questionnaire as to Mental Residual Functional

Capacity of Plaintiff (R. 341-44). He found Plaintiff was extremely limited in her ability to accept

20

instruction from or respond appropriately to criticism from supervisors or superiors; was mildly limited in her ability to work in coordination with or proximity to others without distracting them or exhibiting behavioral extremes; was markedly limited in her ability to respond appropriately to co-workers or peers; and was moderately limited in her ability to relate to general public and maintain socially appropriate behavior (R. 341-42). Dr. Cerra noted, in answer to the question, "Would your answers to the above few questions change if only minimal contact or interaction with others is required?" that "The less interaction required with others the better but still significantly impaired" (R. 342).

Dr. Cerra also found Plaintiff was markedly limited in the following abilities: perform and complete work tasks in a normal work day or week at a consistent pace; work in cooperation with or in proximity to others without being distracted by them; maintain attention and concentration for more than brief periods of time; and perform at production levels expected by most employers. Dr. Cerra found Plaintiff was moderately limited in her ability to process subjective information accurately and to use appropriate judgment and her ability to carry through instructions and complete tasks independently (R. 342).

Dr. Cerra found Plaintiff was limited as follows: markedly limited in her ability to respond appropriately to changes in the work setting; moderately limited in her ability to remember locations and workday procedures and instructions; moderately limited in her ability to be aware of normal hazards and take necessary precautions; markedly limited in her ability to behave predictable, reliably and in an emotion stable manner; and extremely limited in her ability to tolerate customary work pressures. Dr. Cerra found Plaintiff had no limitations in her ability to maintain personal appearance and hygiene. Dr. Cerra found Plaintiff's condition would be likely to deteriorate if she

21

were placed under stress at a job but that Plaintiff could manage her finances (R. 343).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, ALJ Slahta made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's depression etc [sic] are [sic] considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(b).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant has the residual functional capacity to perform a range of sedentary work. She requires a sit/stand option. Due to her shoulder and hand complaints, she can do no overhead reaching, and the job should be primarily gross grasping, as opposed to fine manipulation. Due to her vision impairment, she cannot work around hazards. Due to her anxiety and depression, she is only suited for unskilled, low stress, 1-2 step tasks, with routine repetitive processes. She requires entry level work that involves primarily things, instead of people.

7. The claimant is unable to perform any of her past relevant work (20 CFR §§ 404.1565 and 416.965).

8. The claimant is a "younger individual" (20 CFR §§ 404.1563 and 416.963).

9. The claimant has a "high school (or high school equivalent) education" (20 CFR §§ 404.1564 and 416.964).

10. The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR §§ 404.1568 and 416.968).

22

11.    The claimant has the residual functional capacity to perform a significant range of sedentary work (20 CFR §§ 404.1567 and 416.967).

12.    Although the claimant's exertional limitations do not allow her to perform the full range of sedentary work, using Medical-Vocational Rule 201.28 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as a general office clerk or a machine tender.

13.    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)) (R. 29-30).

## IV. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir.

23

1987).

## B. Contentions of the Parties

The Plaintiff contends:

1.  The ALJ erred in rejecting the opinion of Dr. Cerra.

2.  The ALJ failed to follow the remand order of the Appeals Council.

3.  The ALJ erred in determining that Plaintiff is capable of substantial gainful activity.

The Commissioner contends:

1.  Neither one of Dr. Cerra's opinions were "well-supported" by "medically acceptable clinical and laboratory diagnostic techniques" (Defendant's brief at p. 7) and Dr. Cerra's opinion was "internally inconsistent" and not consistent with the other evidence of record (Defendant's brief at p. 8).

## C. Treating Physician

Plaintiff states in her brief that the ALJ found Dr. Cerra's December 11, 2003, opinion was internally inconsistent with Dr. Cerra's April 2003 report. She then goes on to argue the following: "This determination of internal inconsistencies in Dr. Cerra's opinions by the ALJ was incorrect because the April 2003 report was formatted differently than the October 2004 report" (Plaintiff's brief at p. 5). Plaintiff asserts Dr. Cerra's April 2003 report has three categories of deficiencies (mild, moderate, severe) while the October 2004 report has five (none, mild, moderate, marked, extreme). Plaintiff argues that a finding by Dr. Cerra of a moderate limitation in the April 2003 report should have been translated into a marked limitation in the October 2004 form; therefore, according to Plaintiff, the April 2003 and the October 2004 reports of Dr. Cerra are consistent. Plaintiff also argues that "in the year and a half between those examinations, it is entirely plausible that [Plaintiff's] impairments worsened" (Plaintiff's brief at p. 5). Additionally, Plaintiff argues

the ALJ should have "accorded . . . the weight of the evidence . . . to Dr. Cerra's opinion" and not

Dr. Young's opinion because Dr. Young conducted a consultative examination of Plaintiff, which

occurred "two years before the October 2004 report of Dr. Cerra, more than enough time for

[Plaintiff's] condition to deteriorate" (Plaintiff's brief at p. 5).

Defendant offers several points of argument in her brief to support the ALJ's evaluation of

the opinion of Dr. Cerra; however, the most relevant point Defendant makes is that Plaintiff did not

submit Dr. Cerra's October 28, 2004, Questionnaire as to Mental Residual Functional Capacity to

the ALJ prior to his rendering the decision in this case (Defendant's brief at p. 6). The ALJ,

therefore, was unaware of the opinion of Dr. Cerra when he made his December 30, 2004, decision

that Plaintiff was disabled. The undersigned finds the evidence of record supports Defendant's

argument.

The following is a time line relative to Dr. Cerra's October 28, 2004, report:

1. On October 21, 2004, ALJ Slahta conducted an administrative hearing on Plaintiff's claims (R. 378).

2. At the conclusion of the administrative hearing, the ALJ left the record open for ten day for the submission of additional evidence (R. 400).

3. On October 28, 2004, Dr. Cerra completed the Questionnaire as to Mental Residual Functional Capacity of Plaintiff (R. 341-44).

4. According to the record in this case, this report was not submitted to the ALJ for his consideration in making his decision relative to Plaintiff's claims (R. 2-8, 20-30).[1]

[1]The index to this case has referenced the October 28, 2004, report as part of a twelve page document that was received by the Appeals Council; specifically, the index reads as follows: "Legal brief dated February 7, 2005 from Eileen Goodin, Attorney at Law, attached are included duplicates of the Exhibit . . . 13F" (R. 8) This entry is incorrect. Document 13F is Dr. Cerra's Questionnaire as to Mental Residual Functional Capacity dated December 11, 2003 (R. 262-65). The Exhibit attached to the February 7, 2005, legal brief submitted to the Appeals Council is not Dr. Cerra's Questionnaire as to Mental Residual Functional Capacity dated

25

5.      On December 30, 2004, the ALJ rendered his decision in this matter, finding Plaintiff was not disabled (R. 20-30).

6.      Plaintiff requested review of the ALJ's decision by the Appeals Council on January 13, 2005 (R. 15).

7.      On February 7, 2005, Plaintiff provided Dr. Cerra's Questionnaire as to Mental Residual Functional Capacity, dated October 28, 2004, to the Appeals Council (R. 334, 341-44).[2]

8.      The Appeals Council denied Plaintiff's request for review on December 7, 2005 (R. 9-11).

Plaintiff's argument that the ALJ erred in rejecting the opinion of Dr. Cerra because he failed to correctly evaluate the October 28, 2004, report of Dr. Cerra is without merit because the ALJ was not provided that report to evaluate; therefore, he could not weigh and discuss the evidence as it related to Plaintiff's limitations.

The undersigned notes Plaintiff does not argue that the Appeals Council failed to properly consider the October 28, 2004, report of Dr. Cerra, as new and material evidence; however, the undersigned will address the Appeals Council treatment of the evidence submitted to it by Plaintiff's counsel. In *Wilkins v. Secretary*, 953 F.2d 93 (1991), the Fourth Circuit determined that the Appeals Council will consider evidence submitted to it if the evidence is (1) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision. *Wilkins, supra*, further defined the terms "new" and "material" as follows: "Evidence is new . . . if it is not duplicative or cumulative . . . .

---

December 11, 2003 (Ex. 13F); it is Dr. Cerra's Questionnaire as to Mental Residual Functional Capacity dated October 28, 2004 (R. 341-44).

[2]Plaintiff's counsel wrote in her cover letter to the Appeals Council that she included the October 28, 2004, report by Dr. Cerra because it had "not yet been made a part of the record" and requested that it be made "a part of the record at [that] time" (R. 334).

26

Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." *Id.* at 96.

Dr. Cerra's October 28, 2004, Questionnaire as to Mental Residual Functional Capacity related to the relevant period in question. It was, however, not new. It was duplicative; Dr. Cerra completed the exact form of Plaintiff on December 11, 2003 (R. 341-44, 262-65). A comparison of those reports shows that Dr. Cerra found in the October 28, 2004, report that some Plaintiff's limitations improved, some did not change, and some became worse; however the degree of change was not significant. He found Plaintiff's abilities to work in coordination with or in proximity to others without distracting them or exhibiting behavioral extremes improved in October 2004 as compared to December 2003 (R. 341, 262). He found Plaintiff's ability to process subjective information accurately and to use appropriate judgment had improved in that time period (R. 342, 263). He found Plaintiff's ability to relate to the general public and maintain socially appropriate behavior improved (R. 3432, 263). Dr. Cerra found Plaintiff's ability to maintain personal appearance and hygiene had also improved in October 2004 (R. 343, 263). Dr. Cerra found the following abilities were unchanged: ability to accept instruction from or respond appropriately to criticism from supervisors or superiors; ability to respond appropriately to co-workers or peers; and ability to carry through instructions and complete tasks independently (R. 341-42, 262-63). Plaintiff's following abilities, according to Dr. Cerra, changed from moderate to marked: perform and complete work tasks in a normal workday or work week at a consistent pace; work in cooperation with or in proximity to others without being distracted by them; maintain attention and concentration for more than brief periods of time; perform at production levels expected by most employers; respond appropriately to changes in work settings; and behave predictably, reliably and

in an emotionally stable manner (R. 344-45, 263-64). Dr. Cerra found Plaintiff's ability to remember locations and workday procedures and instructions changed from mild to moderate (R. 343, 264). Dr. Cerra found Plaintiff's ability to tolerate customary work pressures changed from marked to extreme (R. 343, 264). Because the October 28, 2004, report was duplicative of the December 11, 2003, report completed by Dr. Cerra and because the changes findings were minor, it qualified as cumulative evidence to the Appeals Council.

As to whether the Appeals Council erred in determining Dr. Cerra's October 28, 2004, was not material and did not warrant a basis for changing the ALJ's decision, the undersigned finds there was not a reasonable possibility that the new evidence would have changed the outcome if the case had it been remanded to the ALJ for his consideration of this evidence. This report is duplicative and it is cumulative relative to Dr. Cerra's December 11, 2003, Questionnaire as to Mental Residual Functional Capacity report of Plaintiff. The ALJ in this case provided a thorough examination of Dr. Cerra's December 11, 2003, report in his decision. The ALJ found Dr. Cerra's December 11, 2003, report was internally inconsistent with his own April 18, 2003, Routine Abstract Form Mental. He noted Dr. Cerra had found Plaintiff had experienced panic attacks that had required treatment at an emergency room, but had failed to substantiated that claim with medical evidence. The ALJ found Dr. Cerra's opinion that Plaintiff's abilities to respond appropriately to co-workers and peers was marked and her ability to accept instruction from or respond appropriately to criticism from supervisors or superiors was extreme was not supported by the evidence of record; specifically, that evidence was Plaintiff's statements to Dr. Young that she had no issues with interpersonal interaction with supervisors or co-workers. The ALJ found Dr. Cerra's opinions as to Plaintiff's social interaction, as reported in the December 11, 2003, questionnaire, were not supported by Plaintiff's

statements that Plaintiff was able to travel by car to the State of Florida and stay with a friend for five or six weeks (R. 25). Additionally, the ALJ relied on Plaintiff's own testimony as to her activities of daily living and limitations to evaluate Dr. Cerra's December 11, 2003, opinion (R. 24). Based on the above analysis, the undersigned finds the October 28, 2004, Questionnaire as to Mental Residual Functional Capacity is not new and material evidence.

Plaintiff does not argue in her brief that Dr. Cerra's October 23, 2004, Questionnaire as to Mental Residual Functional Capacity is new and material evidence to the Court; nonetheless, the undersigned opines that, for the same reasons stated in the above analysis of the Appeals Council's hypothetical consideration of this issue, the evidence is rejected as new and material.

For the above stated reasons, the undersigned finds substantial evidence supports the ALJ decision relative to the opinion of the treating psychologist.

### D. Appeals Council Remand

Plaintiff argues the "ALJ failed to explain his reasoning for denying [Plaintiff's] [treating psychologist's] opinion great weight in his second decision" as directed on remand by the Appeals Council (Plaintiff's brief at p. 6). Defendant provided no argument in opposition to this contention.

The Appeals Council, in its April 28, 2004, remand of the ALJ's February 4, 2004, decision, ordered the following:

> The claimant's treating psychologist, Victor Cerra, Ed.D., provided opinion (Exhibit 13F) regarding the claimant's work related limitations. The decision states that the Administrative Law Judge "does not give controlling weight to the opinion of Dr. Cerra regarding all substantial gainful activity." However, the decision fails to actually describe or evaluate the opinion which included a determination that the claimant had marked difficulty with work pressures, marked inability to process subjective information, extreme inability to accept instructions etc. In addition, the decision indicates greater weight would be accorded nonexamining physician opinion over that of the claimant's treating physician without providing an adequate basis in

29

the record for doing so. The Council notes the State agency opinion evidence is from April 2003 while Dr. Cerra's evaluation is for the period May 2003 through November 2003. Further evaluation of treating source medical opinion is therefore required (R. 67).

Plaintiff argues the ALJ's second decision contains "largely the same, limited reasons" for not assigning great weight to the opinion of Dr. Cerra as were noted in the first decision (Plaintiff's brief at p. 6). Specifically, Plaintiff asserts the ALJ rejected Dr. Cerra's opinion in both decisions because supporting evidence about one of Plaintiff's panic attacks being treated at an emergency room was not provided and Dr. Cerra's opinions were internally inconsistent with other medical opinions of record. The undersigned disagrees. In the December 30, 2004, decision, the ALJ complied with the April 28, 2004, remand order of the Appeals Council by further considering, describing and evaluating the December 11, 2003, opinion of Dr. Cerra.

In his December 30, 2004, decision, the ALJ gave "little weight to the opinion of Dr. Cerra." In support of that finding, the ALJ complied with the remand order of the Appeals Council and provided specific reasons for that assignment of weight. The ALJ discussed the note Dr. Cerra wrote relative to Plaintiff being excused from serving as a juror, wherein Dr. Cerra opined Plaintiff "had concentration and memory problem"; however, the ALJ noted Dr. Cerra's examination notes revealed she had no problem with memory or concentration, her memory functioning and her pace at completing tasks were normal, and her persistence and concentration were mildly to moderately deficient (R. 25).

Additionally, in providing reasons for not assigning great weight to the opinion of Dr. Cerra, the ALJ evaluated Dr. Cerra's December 11, 2003, findings relative to Plaintiff's social functioning; specifically, that Plaintiff had marked to extreme limitations in accepting instructions from

supervisors, in responding appropriately to co-workers, in processing subjective information accurately, and in tolerating customary work procedures. He found these findings were "not particularly persuasive considering the other evidence." That "other evidence" was Dr. Cerra's April 18, 2003, opinion, lack of evidence of record, Plaintiff's statements to Dr. Young, Plaintiff's activities, and Plaintiff's testimony (R. 25).

The ALJ found Dr. Cerra's December 11, 2003, report was "internally inconsistent with his report from April 2003 (Exhibit 8F)." In the December 11, 2003, report, Dr. Cerra found Plaintiff's social functioning was markedly or extremely limited; in his April 18, 2003, report, he found Plaintiff's social functioning was moderately deficient (R. 262-63, 232, 25). The ALJ found Dr. Cerra's December 11, 2003, opinion was not particularly persuasive when he compared it to statements made by Plaintiff to Dr. Young. Plaintiff informed Dr. Young she "had no issues with interpersonal interaction with supervisors or co-workers" (R. 25). This statement by Plaintiff contradicts the December 11, 2003, finding by Dr. Cerra. The ALJ considered Dr. Cerra's opinion that Plaintiff could not serve as a juror due to panic attacks, which required an emergency room visit; however, treatment of the panic attack at the emergency room was not substantiated by any evidence if record. This assertion, therefore, could not be verified by medical evidence. The ALJ also found Dr. Cerra's opinion relative to Plaintiff's marked or extreme social limitations was inconsistent with evidence that Plaintiff experienced mild restriction to her activities. The ALJ provided the following examples to support that finding: Plaintiff was able to take care of her activities of daily living and personal care; Plaintiff helped her child get ready for school; Plaintiff completed light housework, Plaintiff cooked, Plaintiff did laundry; Plaintiff shopped when it was not crowded; Plaintiff cared for all her personal grooming and hygiene needs; and Plaintiff drove to Florida with her mother and

31

stayed with a friend (R. 24, 25).

Finally, in stating reasons not to assign great weight to the opinion of Dr. Cerra, the ALJ evaluated and considered Plaintiff's testimony relative to her social functioning, which was as follows: she experienced anxiety and panic attacks in connection with "people involved in work-related litigation"; she scanned parking lots to be aware of what people from her former work were near her; she shopped when it was not crowded; she shopped out of town to avoid contact with former coworkers who were named in litigation; she picked up her son from school (she waited in the car); she spoke with friends on the telephone; she e-mailed friends; and she traveled to Florida with her mother, where she stayed with a friend for five or six weeks. In analyzing Plaintiff's testimony, the ALJ found, "Clearly, the [Plaintiff] has problems in her social functioning, but not to a degree that would prohibit all social contacts" (R. 24, 27).

The undersigned finds the analysis of the opinion of Dr. Cerra by the ALJ is well reasoned and comports with the remand order by the Appeals Council. The ALJ's decision to assign "little weight" to the opinion of Dr. Cerra" is supported by substantial evidence.

### E. Substantial Gainful Activity

Plaintiff argues the ALJ erred in determining Plaintiff was capable of substantial gainful activity. Plaintiff asserts the number of available jobs to her was eroded because she required a sit/stand option and she was unable to use one of her hands. Plaintiff also asserted the ALJ failed to "adequately account for [Plaintiff's] psychological impairments" when he found Plaintiff was "capable of sedentary work with a sit/stand option, no overhead reaching, only gross grasping (no fine manipulation), no work around hazards, only unskilled, low stress, 1-2 step tasks, routine repetitive processes, and only entry level work primarily with things, not people" (Plaintiff's brief

32

at pp. 7-8). Defendant did not offer any argument in opposition to this contention.

The ALJ found Plaintiff was capable of sedentary work; specifically, he found she required "a sit/stand option" with "no overhead reaching" and "primarily gross grasping, as opposed to fine manipulation" (R. 27). With this limitation the VE opined the following: "At the sedentary level, Your Honor, that hypothetical individual could function in some general office clerk positions. The total number available 299,000 nationally, and 2900 regionally. . . . But I would give at least a 50 percent reduction because some of those would have . . . addressing envelopes and things like that that would be considered more fine manipulation. And machine tender, sedentary, 141,000 nationally and 1400 regionally" (R. 396-97). In his decision, the ALJ noted the VE had reduced the number of jobs available to Plaintiff and adopted that reduction (R. 28).

Plaintiff relies on SSR 83-12, which provides for an assessment by a VE when alternating sitting and standing and/or loss of use of an upper extremity are factored into an individual's limitations. Specifically, SSR 83-12 provides the following: "In cases of unusual limitation of ability to sit or stand, a VS [VE] should be consulted to clarify the implications for the occupational base" and "[g]iven an individual's particular RFC, a VS [VE] will be able to determine the size of the remaining occupation base, cite specific jobs within the individual's RFC, and provide a statement of the incidence of those jobs in the region of the individual's residence or in several regions of the country." In the instant case, that is what occurred. The sit/stand option and the reduction of use of the upper extremity were included in Plaintiff's RFC by the ALJ, a VE was consulted, those limitations were considered by the VE, the VE reduced the base of sedentary jobs available to the Plaintiff due to those limitations, and still a significant number of jobs in the national and regional economy were available to Plaintiff at the sedentary level.

33

The psychological impairments to which Plaintiff refers in her brief are defined by Plaintiff as follows: "Her extreme limitations in her abilities to accept instruction, respond appropriately to criticism from supervisors or superiors, and tolerate customary work pressures, and her marked impairments in her abilities to maintain socially appropriate behavior, process subjective information accurately, to use appropriate judgment, work at a consistent pace, work with others without being distracted by them, maintain attention and concentration for more than brief periods of time, perform at production levels expected by most employers, respond appropriately to changes in the work setting, and to behave predictably, reliably, and in an emotionally stable manner" (Plaintiff's brief at p. 8). These impairments are those found in the October 28, 2004, report of Dr. Cerra, which was not provided as evidence to the ALJ for his consideration in rendering his decision in this case.

In considering Plaintiff's anxiety and depression and determining Plaintiff was "only suited for unskilled, low stress, 1-2 step tasks, with routine repetitive processes . . . [and] require[d] entry level work that involve[d] primarily things, instead of people" the ALJ relied on medical opinion evidence of record of other doctors and Plaintiff's statements to determine Plaintiff's limitations were not marked or extreme (R. 27).

The ALJ noted that on December 30, 2002, Plaintiff informed Dr. Young she had no difficulty making "basic routine daily decisions." She denied feelings of hopelessness, uselessness, or worthlessness. She admitted to feeling somewhat depressed. Plaintiff informed Dr. Young she enjoyed being in the company of others and had an interest in pleasurable activities. Dr. Young opined Plaintiff was alert and cooperative and maintained good eye contact. Her thought processes were intact and she displayed no psychotic symptoms. Dr. Young opined Plaintiff's concentration, memory, and social abilities were normal (R. 23).

The ALJ found Plaintiff had "mild restrictions of activities of daily living" and he based that finding on what Plaintiff asserted she could do. Plaintiff was able to take care of her personal needs, helped her son get ready for school, did light housework, cooked, and did laundry (R. 24). The ALJ found Plaintiff had moderate difficulty maintaining social functioning, and he based that finding on Plaintiff's testimony. The ALJ noted Plaintiff stated she experienced anxiety and panic attacks and had difficulty leaving the house because she feared encountering individuals against whom she had filed a work-related law suit. Plaintiff testified she scanned parking lots when she traveled and was aware of her environment so she could be aware of the presence of former co-workers. Plaintiff testified that she was still able to shop and collect her son from school. She telephoned friends. She traveled to Florida with her mother and stayed for five or six weeks with a friend while there (R. 24).

The ALJ also found Plaintiff had "moderate deficiencies in concentration, persistence or pace." In making that finding, the ALJ relied on Plaintiff demonstrating no memory or concentration impairments during a consultative examination. Additionally, the ALJ noted that on April 18, 2003, Dr. Cerra had indicated that Plaintiff's memory functioning was normal; her pace when completing tasks was normal; and her persistence and concentration were mildly to moderately deficient.

The undersigned finds Plaintiff's argument that her physical impairments severely limit the number of sedentary jobs which she could perform when combined with her psychological limitations and prevent her from performing sustained work at any exertional level is without merit. The ALJ's inclusion of unskilled, low stress, one-two step tasks, with routine repetitive processes, that required entry level work, involving primarily things instead of people, adequately encompassed Plaintiff's mental impairments in his RFC; therefore, the finding that significant jobs in the national and regional economy exist for Plaintiff is valid. The undersigned finds that, for the above stated

35

reasons, substantial evidence supports the ALJ's finding relative to Plaintiff's RFC and substantial gainful activity, specifically, that a significant number of jobs are present in the national and regional economy for Plaintiff to perform.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Statement of Errors be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable W. Craig Broadwater, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this **27** day of *November* , 2006.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE